Filed 2/1/24  Karma Capital v. Nakhleh CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| KARMA CAPITAL, INC. et al, | D080588 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2021-00001088-CU-FR-CTL) |
| ELIAS NAKHLEH et al. | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Mirch Law Firm, Kevin Mirch, and Marie C. Mirch, for Plaintiffs and Appellants.

Gordon Rees Scully Mansukhani, Matthew G. Kleiner, and Andrea K. Williams, for Defendants and Respondents.

Karma Capital, Inc. (Karma), Marcus Gates, and Trisha Gates (Karma, Marcus, and Trisha, collectively Appellants) appeal an order granting a motion to disqualify their counsel, the Mirch Law Firm and its attorneys (the Mirch Firm) from representing Appellants in their lawsuit against Elite

Restaurant Group, Inc. (Elite), Elias Nakhleh (Elite and Elias, together Respondents), and others.

This appeal follows the third time the Mirch Firm has been disqualified in representing various plaintiffs who allege they were duped by Respondents and others into purchasing worthless restaurant franchises. Here, the operative complaint concerns Appellants' acquisition of eight Daphne's restaurants in San Diego County and names Elite, Michael Nakhleh, Elias Nakhleh, and others as defendants.[1] In the other two suits, the Mirch Firm represented multiple franchisees of the Slater's 50/50 brand in lawsuits against Slater's 50/50 Franchise, LLC (Slater's) (the franchisor), Elite (its parent company), and Elias and Michael (the principals for Slater's and Elite). Despite the instant matter concerning Daphne's franchises, the claims made here are similar to those made in the other two cases.

The first case was a civil action filed in federal court where the Mirch Firm was representing franchisee Zia Abhari in a civil action against Elite and Slater's (Abhari litigation). In that case, Elite and Slater's successfully moved to disqualify the Mirch Firm based on the firm's communications with and connections to Martin Reiner. Although Reiner was disbarred by the State Bar of California in 2017, he nevertheless held himself out to be a licensed attorney. Abhari referred to Reiner as his "attorney" and recommended him to Michael to handle a legal issue Slater's and Elite were experiencing. Michael hired Reiner and gave him a check for $10,000, which Michael believed to be an attorney retainer fee. Additionally, Reiner requested that Michael sign a document to authorize Reiner to represent

---

[1] Because Michael and Elias share the same surname, we will refer to them by their respective first names to avoid confusion. We do the same for Marcus and Tricia Gates. In addition, we observe that Michael has not been served in the instant action.

2

Elite and Slater's in a trademark infringement lawsuit. Reiner then proceeded to commence a trademark infringement suit for the " '50/50 Burger' " trademark in Los Angeles Superior Court. Whether an attorney-client relationship was thus formed between Reiner on the one hand and Elite, Slater's, and Michael on the other was a contested issue in the Abhari litigation. Also, the Mirch Firm challenged whether it had acquired any attorney-client privileged information from Reiner, who appeared with the Mirch Law Firm at a mediation between the plaintiffs (who included Abhari) and Slater's. The district court ultimately answered the two preceding questions in the affirmative and granted the motion to disqualify the Mirch Firm. The Ninth Circuit affirmed the order. (See *Mirch Law Firm, LLC v. Nakhleh* (9th Cir. May 26, 2022, No. 20-56207) [2022 U.S.App. LEXIS 14564, at pp. *3–4] (*Mirch Law Firm, LLC*).)

In a similar suit filed in Orange County Superior Court wherein the Mirch Firm represented plaintiffs suing Slater's, Elite, and Elias (the Slater's parties), the trial court granted the Slater's parties' motion to disqualify the Mirch Firm. In doing so, the court found: (1) Elite and Slater's reasonably believed they had an attorney-client relationship with Reiner in a trademark infringement suit; (2) Reiner asked Michael, as a principal of both companies, to sign a conflict waiver to allow Reiner to pursue another claim against Elite and Slater's in another federal action; (3) Reiner took certain actions to convince others he was a licensed attorney; (4) during a mediation, the Mirch Firm described Reiner as a " 'lawyer with licensing problems' "; (5) Michael disclosed to Reiner sensitive information concerning the business operations, assets, and proprietary procedures relative to Elite and Slater's; (6) the information provided to Reiner was relevant to the plaintiffs' claims against the Slater's parties; and (7) the Mirch Firm received several e-mails from

3

Reiner. Based on these communications, the trial court found that the Slater's parties established that Reiner was given privileged information, which he, in turn, conveyed to the Mirch Firm. And the court concluded that the plaintiffs did not meet their burden of rebutting the presumption that the Mirch Firm received privileged information. Our colleagues in Division Three of the Fourth Appellate District affirmed this order in an unpublished opinion. (See *Ace Foods, LLC v. Slater's 50/50 Franchise, LLC* (Mar. 14, 2023, G061049) [nonpub. opn.] (*Ace Foods*).)

In the instant matter, largely based on much of the same evidence offered in the previous two cases, the trial court granted Respondents' motion to disqualify the Mirch Firm. In doing so, the court found Respondents had shown that the Mirch Firm received confidential information, including communications between Michael and Reiner. Thus, the court concluded a rebuttable presumption arose that Reiner disclosed or provided access to privileged information to the Mirch Firm. Moreover, the court found that the Mirch Firm had not rebutted this presumption. Although the Mirch Firm attested that they did not receive any privileged information, the court determined "the weight of the evidence show[ed] otherwise."

Appellants contend the trial court erred in granting the disqualification motion because: (1) there was no attorney-client relationship between Reiner and Respondents; (2) even if there was an attorney-client relationship, there was a joint representation relationship with Abhari and communications made during the joint representation are not privileged; (3) Respondents waived the attorney-client privilege when they filed e-mails between Michael and Reiner as exhibits in its motion to disqualify counsel in the Abhari litigation; (4) because the attorney-client relationship between Reiner and Respondents ended in January 2020, the court erred by relying on

4

communication between Reiner and Michael after this date as evidence the Mirch Firm obtained confidential information; and (5) Respondents failed to establish the Mirch Firm received any information or documents from Reiner. We observe these are similar (if not the same) arguments that were advanced in *Ace Foods*, *supra*, G061049. Like Division Three, we also reject each of Appellants' contentions and affirm the court's order.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2018, Appellants purchased eight Daphne's restaurants in the San Diego area for $1.7 million. Appellants allege that Michael, Respondents, and others engaged in a scheme to "flip" Daphne's restaurants, inflating their value and committing other wrongful acts associated with the sale of these establishments.[2] Therefore, Appellants brought suit alleging nine causes of action in the operative complaint.

In 2019, Michael was a principal for Elite. At that time, Elite owned the trademarks and other intellectual property for the Daphne's restaurant franchises as well as the Slater's 50/50 brand. In June of that year, he had a meeting with Abhari, who owned two Slater's franchises in Southern California. During their meeting, Michael and Abhari discussed "certain legal issues" Slater's and Elite were encountering. Abhari recommended Michael retain his attorney Reiner to represent Elite and Slater's.

Michael met privately with Reiner at Abhari's office outside the presence of Abhari. During the meeting, Reiner told Michael about his litigation work on other matters. Reiner informed Michael a $10,000 retainer fee would be required if Elite and Slater's wanted to retain his services, and

---

[2] The alleged scheme also involved the sale of Slater's, Noons, Gigi's, Marie Calendar's, Mimi's Café, and Patxi's Pizza franchises.

after payment, they would be his client and he could start working on their trademark infringement lawsuit.

Reiner gave Michael an Assignment of Claim document for signature and a cover letter. The header on these documents indicated they were from "Hill Collections, Inc." Both documents were signed by Reiner. The Assignment of Claim stated Michael, as agent for Elite, "hereby assigns to, and authorizes, Hill Collections, Inc. ('Assignee'), to do all things legally necessary for[ ] a claim for trademark infringement, and/or other legal theories, adverse to Frontiere Natural Meats, LLC, and/or other parties involved in that infringement, and to obtain and enforce a judgment, or for other compromise resolution, which in the Assignee's opinion is satisfactory." The Assignment of Claim indicated Hill Collections would retain 30 percent of the amount collected and the remaining 70 percent would be disbursed to Michael for Elite. The Assignment of Claim specified a $10,000 "commencing fee" was "to be paid by the Assignor for all attorney fees, court filing fee costs, and process serving costs." Elite was also responsible for other litigation costs, including depositions and expert fees. The cover letter directed Michael to pay the "commencement fee" to Reiner personally.

In the cover letter, Reiner explained the assignment contract capped attorney fees and court filing fees for pursuing a trademark infringement claim and advised Michael he would "save a substantial amount of money by having the claim prosecuted through [an] assignment." Reiner also cautioned Michael, "Time is of the essence because trademark infringement claims can be subject to such defenses as laches, and waiver, so we want to get started as very soon as is possible."

6

Michael signed the Assignment of Claim document and provided Reiner a $10,000 check from "Slater's 50/50 Franchise, LLC," "for what [he] understood was, and intended to be, an attorney retainer fee."

After signing the Assignment of Claim document and paying Reiner's fee, Michael believed he, as principal for Elite and Slater's, had an attorney-client relationship with Reiner. Based on this belief, Michael disclosed to Reiner sensitive information concerning the "business operations, assets, and proprietary procedures relative to Elite (and Slater's Franchise), including the business practices . . . , the standard franchise agreements, [and] specific business transactions." At Reiner's request, Michael provided documents and information about Slater's 50/50, including the operations and inner workings of Elite and Slater's Franchise, and various contracts and related documents. Michael also provided Reiner confidential internal information about Elite and Slater's Franchise's other disputes and transactions. Michael provided this information to Reiner because he believed it was protected by attorney-client privilege.

In August 2019, Hill Collections filed a trademark infringement action in the Superior Court of California, County of Los Angeles, acting as the assignee of Elite's claims. The complaint filed in the action identified Christopher Weston as the attorney for Hill Collections. Reiner's name does appear on the documents as he signed the proof of service for the summons and complaint to the named defendants.

The trademark infringement case was removed to federal court, and the defendants moved to dismiss it. Reiner e-mailed Michael and requested certain documents for the opposition to the motion to dismiss. Michael forwarded the request to a colleague, explaining his attorney needed the

7

information for the lawsuit.  The federal court dismissed the case in December 2019.

During the trademark infringement litigation, Michael believed Reiner was his attorney.  Michael was unaware Weston was listed as counsel on the superior court filing.  Michael received no communication from Weston; all the communication he received regarding the status of the litigation came from Reiner.

After the trademark infringement case was dismissed, Reiner offered to refile the lawsuit.  He also requested Michael provide a conflict waiver to enable him to pursue Abhari's legal claims against Elite and Slater's.  Michael refused.  Michael then ended the attorney-client relationship with Reiner.

Without a waiver, Reiner began pursuing Abhari's claims against Elite and Slater's, acting as the legal representative for Abhari and Abhari's company Donya.  Reiner engaged in settlement discussions with Michael's business counsel regarding the claim.  He also e-mailed a settlement offer to the insurance company concerning the claim. Reiner's e-mails with the insurance company and business counsel were sent from his e-mail address "martinreinerlaw@yahoo.com."

Shortly thereafter (March 2020), Michael and his business counsel realized Reiner had been disbarred by the State Bar of California and was not a licensed attorney.  When Michael questioned Reiner about this, Reiner denied his license had been suspended or that he had been disbarred.  Reiner asserted:  "Any order to either effect is legally null and void.  Furthermore, I have never represented myself to you as acting as an attorney.  I am here in the capacity as the office manager.  If anyone represented anything different about me, they were incorrect.  Respectfully, your misperceptions about me

8

should not interfere with your need to communicate your consent to the claim made with [the insurance company]." In response, Michael stated Reiner had represented to him that he was an attorney. Michael also sent a screen shot of Reiner's profile on the State Bar of California's website, which showed Reiner was disbarred and prohibited from practicing law. Reiner claimed the "State Bar's representation" was not "the official word" and was "fake news."

Michael repeated his claim Reiner had represented to him that he was an attorney "multiple times." Additionally, Michael pointed out to Reiner that Reiner's "own texts and emails to [Michael] have represented that [Reiner is] an attorney." Michael also emphasized that when he first met Reiner, Reiner said he was an attorney and Abhari had shared e-mails and texts stating Reiner was Abhari's attorney. Michael's business counsel stated he believed Reiner had been acting as counsel for Abhari and Donya during their discussions, and he suggested Reiner change his e-mail address to avoid misleading others.

In June 2020, the Mirch Firm filed the complaint in the Abhari litigation, alleging, among other things, that the Slater's parties made certain misrepresentations to Abhari to induce him to purchase two Slater's restaurants. The Slater's parties were represented in the litigation by the law firm of Gordon Rees Scully Mansukhani (Gordon Rees). The parties and their attorneys participated in mediation. Reiner attended the mediation with Abhari. At the mediation, the Mirch Firm represented to opposing counsel that Reiner was a " 'lawyer with licensing problems.' "

A Gordon Rees attorney subsequently communicated with the Mirch Firm about Reiner's role with the Mirch Firm. The attorney stated she recently learned Reiner had served as counsel for Slater's and Elite in the trademark infringement litigation and during this representation he had

9

obtained privileged attorney-client information. She believed the Mirch Firm's involvement with Reiner required the Mirch Firm to withdraw from the Abhari litigation or be disqualified.

The Mirch Firm responded there was no basis for disqualification. It denied Reiner worked with the firm and that he was "acting in any capacity as an attorney" in the case. The Mirch Firm represented Reiner did clerical work for Abhari and was present at the mediation to assist Abhari "with the language barrier."

In a subsequent letter to opposing counsel, the Mirch Firm stated that at the mediation, Reiner "was introduced as a lawyer with licensing problems . . . acting as an assistant to Mr. Abhari and Donya Entertainment." The Mirch Firm indicated it was shocked to learn Reiner had been retained by Michael. One of the attorneys at the Mirch Firm stated she had never met Reiner face to face and had only limited conversations with him. She expressed her understanding he was "an unlicensed attorney fighting a disciplinary matter and acting as an employee for Donya Entertainment."

After being notified of the communication between the Mirch Firm and Gordon Rees, Reiner then e-mailed the Gordon Rees attorneys representing the Slater's parties from his "martinreinerlaw@yahoo.com" e-mail address and copied attorneys at the Mirch Firm. In the e-mail, he denied serving as counsel for Michael, Slater's, or Elite. He stated he had "communicated with the Mirch Firm as a witness" and he worked for Abhari and Abhari's businesses "in a non-professional capacity." He cautioned the Gordon Rees attorneys, "[t]he only way in which you can proceed with your proposed motion [for disqualification] is by Michael Nakhleh committing the crime of

10

perjury, which would necessitate [Gordon Rees] committing the crime of suborning Michael Nakhleh's perjury. Respectfully, do not do that."

The Slater's parties moved to disqualify the Mirch Firm from the Abhari litigation in federal court. In support of the opposition to that motion, Reiner submitted a declaration. In his declaration, Reiner admitted he was disbarred in 2017 but stated he contested his disbarment as "null and void for being premised upon a wrongful deprivation of [his] [p]rocedural [d]ue process." He declared he worked for Abhari's companies as an office manager and not as an attorney. Reiner averred he met with Michael and had him sign the Assignment of Claim form, but Reiner denied presenting himself as an attorney for Elite and Slater's and stated it was unreasonable for Michael to claim Reiner was an attorney for those companies. Reiner also denied receiving any confidential or attorney-client privileged information from Michael, Slater's, or Elite. He asserted the information he received from them was public information and had no relevance to the Abhari litigation. He denied providing to or discussing with the Mirch Firm any information or documents he received in the trademark infringement litigation.

To support its opposition to the disqualification motion, the Mirch Firm submitted e-mails between Michael and Reiner it claimed had been provided by Abhari. Abhari, however, had not been included as a recipient on some of these e-mails. The Mirch Firm also submitted an e-mail it received from Reiner explaining Michael "wired the money for Hill Collections, Inc.'s litigation expenses to [Reiner's] bank account" for the trademark infringement litigation "because Hill Collections, Inc. had been recently formed" and did not have a corporate bank account at that time.[3]

---

[3] The record indicates that Michael wrote a check to Reiner and did not wire money to Reiner's account.

11

During the Abhari litigation, the Mirch Firm sent correspondence to the Slater's parties' counsel regarding an argument made in the trademark infringement case—the "argument that Slater's 50/50 is not a proper trademark/tradename because it is a 'non-famous generic name' not eligible for such action." The Mirch Firm claimed Abhari would not have purchased the franchise if he had known the legitimacy of the trademark/tradename was at issue. The Mirch Firm further asserted the Nakhlehs and Slater's did not disclose these trademark/tradename problems. With the letter, the Mirch Firm sought the names of witnesses to depose "to determine the time of Nakhleh Defendants' knowledge that Slater's 50/50 franchises [were] worthless."

The federal district court granted the defendants' motion to disqualify the Mirch Firm as Abhari's counsel. The federal court found Reiner falsely represented to the Slater's parties he was their attorney and obtained privileged information relevant to the Abhari litigation. The court further found the Mirch Firm was using that privileged information "to gain a tactical advantage in [the] case." Based on Reiner's admission he had communicated with the Mirch Firm as a witness and Reiner's attendance at the mediation, the court found there was a legal presumption the Mirch Firm " 'possesses confidential attorney-client information materially related to the proceedings before the court,' and that this information 'has been used or disclosed.' [Citation.]" The district court found the Mirch Firm failed to rebut this presumption and concluded disqualification was the appropriate remedy.

The Mirch Firm appealed, and in an unpublished opinion, the Ninth Circuit affirmed the district court's order granting defendants' motion to disqualify the Mirch Firm finding that Reiner had obtained privileged

12

information from Elite and Slater's, that the privileged information was material to the underlying lawsuit, and that there was "a 'sound basis,' [citation], for the district court's conclusion that disqualification was required to remedy the unfair advantage that Plaintiffs obtained through Mirch's representation." (*Mirch Law Firm, LLC*, *supra*, 2022 U.S.App. LEXIS 14564, at p. *4.)

The Mirch Firm also represented Ace Foods, LLC and Seth Lindauer in a lawsuit filed in the Orange County Superior Court, naming Elite, the Nakhlehs, and others as defendants (Orange County litigation). Similar to the instant matter and the Abhari litigation, the plaintiffs in the Orange County litigation were franchisee owners and alleged similar claims in their complaint as those alleged in the present lawsuit. Elite, Slater's, and Elias filed a motion to disqualify the Mirch Firm relying on the same facts presented in the Abhari litigation. The superior court granted the motion finding that Reiner had received privileged information, which he provided to the Mirch Firm.

The disqualification order was appealed, and on March 14, 2023, Division Three of this court affirmed the order. (*Ace Foods*, *supra*, G061049.)

Here, the Mirch Firm represented Appellants in their suit against Respondents and others. Again, the Mirch Firm represented entities that purchased restaurant franchises that they claim have been overvalued and misrepresented by the named defendants. Again, the Mirch Firm faced a motion to disqualify their firm based on information they received from Reiner. And again, a trial court granted a disqualification motion aimed at the Mirch Firm. The court explicitly found that Respondents proved the Mirch Law Firm received confidential information, including communications between Michael and Reiner. As such, the court concluded that "a rebuttable

13

presumption arose that Reiner disclosed or provided access to privileged information to the Mirch Firm." The court also determined that the Mirch Firm has not rebutted the presumption and that the "weight of the evidence shows" that the Mirch Firm did receive confidential, privileged information from Reiner. Further, the court specifically considered and rejected the Mirch Firm's claim that the disqualification motion stemmed from disqualification orders that occurred in other courts concerning the sale of different restaurant franchises than the ones at issue in this case: "Even so, the information Elite provided Reiner is relevant to [Appellants'] claims, particularly given the breadth of the allegations in the operative complaint."

Appellants timely appealed.

DISCUSSION

A. Standard of Review

Appellants challenge the trial court's order granting Respondents' motion to disqualify the Mirch Firm. They claim that the applicable standard of review is de novo. Not so.[4] " 'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.]' [Citation.] As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact; 'the reviewing court should not substitute its judgment for . . . express or

_____

[4]    Although Appellants acknowledge that the abuse of discretion standard of review typically applies to an appellate court reviewing an order to disqualify an attorney, they assert the underlying facts here are undisputed. Thus, they urge us to apply a de novo standard of review. We disagree. As we shall discuss *post*, Appellants maintain that certain evidence presented to the court was manufactured and ask us to disregard it. Additionally, the parties challenge some of the trial court's factual findings, which we review for substantial evidence. As such, the underlying facts appear to be highly contested among the parties, and thus, de novo review is inappropriate.

14

implied [factual] findings [that are] supported by substantial evidence. [Citations.]' [Citation.] As to the trial court's conclusions of law, however, review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion. [Citations.] The trial court's 'application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.]" (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159 (*Charlisse C*).) We therefore apply this widely accepted standard of review to the issues presented here.

B. Relevant Law

" 'A trial court's authority to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." [Citations.]' [Citation.]" (*Charlisse C., supra*, 45 Cal.4th at p. 159.) "Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145.)

"It is well established that an attorney, after severing his or her relationship with a client, 'may not do anything which will injuriously affect his former client in any matter in which he formerly represented him nor may he at any time use against his former client knowledge or information acquired by virtue of the previous relationship.' [Citations.]" (*O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1124.) This prohibition is

15

based on governing case law and rule 1.9(a) of the State Bar Rules of Professional Conduct, which prohibits "[a] lawyer who has formerly represented a client in a matter" from representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent."

C. Attorney-Client Relationship

The trial court found that "Elite reasonably believed Martin Reiner was acting as its attorney." Appellants contend there was no attorney-client relationship. We disagree and conclude the court's finding is supported by substantial evidence.

"California's attorney-client privilege is embodied in [Evidence Code] section 950 et seq. and protects confidential communications between a client and his or her attorney made in the course of an attorney-client relationship. [Citations.]"[5] (*Edwards Wildman Palmer LLP v. Superior Court* (2014) 231 Cal.App.4th 1214, 1224.) "Section 951 defines 'client,' for purposes of the privilege, as 'a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity . . . .' [Citation.] Section 950 defines 'lawyer' as 'a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation.' [Citation.]" (*Edwards Wildman,* at p. 1225.) Section 952 defines " 'confidential communication between client and lawyer' " as "information transmitted between a client and his lawyer in the course of that relationship and in confidence . . . ." Section 954 states a client "has a privilege to refuse to

_____

[5] Statutory references are to the Evidence Code unless otherwise specified.

16

disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ."

An "attorney-client relationship is created by some form of contract, express or implied, formal or informal. [Citations.]" (*Fox v. Pollack* (1986) 181 Cal.App.3d 954, 959.) A party's subjective belief an attorney-client relationship exists is insufficient, standing alone, to create such a relationship or a duty of care owed to the party by the attorney. (*Zenith Ins. Co. v. O'Connor* (2007) 148 Cal.App.4th 998, 1010 (*Zenith*).) A party "cannot unilaterally establish an attorney-client relationship, and its hindsight 'beliefs' that such a relationship existed are thus legally irrelevant. [Citation.] Instead, it is the intent and conduct of the parties that control the question as to whether an attorney-client relationship has been created. [Citation.]" (*Ibid.*)

Against this legal backdrop, we evaluate whether the trial court's finding of an attorney-client relationship is supported by substantial evidence. Respondents' motion to disqualify the Mirch Firm included Michael's declaration. In it, he declared he believed an attorney-client relationship was formed with Reiner after Michael signed the Assignment of Claim document and paid Reiner the $10,000 fee required to commence the trademark infringement litigation. This belief was reasonable but is insufficient by itself to establish the existence of an attorney-client relationship. (*Zenith, supra*, 148 Cal.App.4th at p. 1010.) However, there are additional facts concerning Michael's and Reiner's conduct that reflect on their intent. After Michael mentioned his companies had a legal issue, Abhari recommended his attorney Reiner to Michael. When Michael met him, Reiner presented himself as an attorney and told Michael about his litigation work on other matters. At times, Reiner used the e-mail address of

17

"martinreinerlaw@yahoo.com," suggesting he was an attorney. These facts establish Reiner presented himself as an attorney and Michael reasonably believed Reiner was authorized to practice law.

Reiner presented Michael with an Assignment of Claim document and demanded a fee before he would begin working on the trademark infringement lawsuit on behalf of Slater's and Elite. Michael declared Reiner stated Slater's and Elite would be his clients after payment of the fee. The Assignment of Claim and the cover letter with it, both signed by Reiner, are reasonably understood by a layperson as creating an attorney-client relationship. In the cover letter, Reiner explained the assignment contract capped "attorney fees" for pursuing the trademark infringement claim. It was reasonable for Michael to believe an attorney-client relationship was formed when he signed the Assignment of Claim document and paid a retainer fee directly to Reiner. Moreover, during the trademark litigation, Reiner contacted Michael regarding the status of the case and requested Michael provide documents from Elite to support the trademark infringement claim. Thus, there was sufficient evidence an attorney-client relationship was created between Reiner and Elite.

Arguing there was no attorney-client relationship, Appellants attack the validity of the Assignment of Claim document. They assert it was altered and was not signed by Reiner. There is no evidence in the record the document was altered and the record contains one copy signed only by Reiner and a second copy signed by both Michael and Reiner. In addition, Appellants appear to be asking us to reweigh the evidence considered by the trial court. This is not our role in evaluating a trial court's factual finding for substantial evidence. (See *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067, 1087 (*Shadow Traffic*).)

Appellants rely on *Fink v. Shemtov* (2012) 210 Cal.App.4th 599 and assert an assignment of claim does not create an attorney-client relationship. They read the holding in *Fink* too broadly. In that case, the Third Division of this court concluded assignment "arrangements are legal in collection cases and do not create an attorney-client relationship between the assignor and the assignee." (*Id.* at p. 603.) In contrast, here, the assignment agreement was not in a collection case. Moreover, the assignment agreement in the instant matter was substantially different from the assignment agreement in *Fink.* (*Id.* at p. 604.)

Based on the foregoing, we conclude the trial court properly found an attorney-client relationship existed between Reiner and Elite. Therefore, confidential communications made during the course of that relationship are protected by the attorney-client privilege. (§ 952.)

D. Joint Representation

Appellants alternatively argue that even if there was an attorney-client relationship between Reiner and Elite, the trial court erred in ignoring Michael's "sworn admission that a joint representation existed between himself, Elite, Elias Nakhleh, Abhari, Hill Collections and Reiner as his attorney."[6] As such, Appellants maintain Respondents are barred by section 962[7] "from asserting an attorney client privilege under their theory of the case."

---

[6] Appellants' representation of Michael's declaration is not supported by the record.

[7] Section 962 provides "[w]here two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them . . . may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients . . . and another of such clients . . . ."

19

Respondents argue that Appellants did not make this argument below. Appellants counter that the Mirch Firm raised a joint representation argument at the hearing on Respondents' motion to disqualify. However, Appellants do not point to where they made an argument regarding joint representation in their written opposition to the disqualification motion. Moreover, our review of the record shows that Appellants made no such argument until the hearing on the motion.

The trial court was not required to consider the issue of joint representation because it was not fully developed or factually presented in Appellants' trial court briefs in a manner that would permit Respondents to provide a meaningful response. (Cf. *American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 ["possible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' " for summary judgment].) As a general rule of motion practice, courts ordinarily do not consider new issues and evidence presented in reply papers because it deprives the opposing party of an opportunity to counter the argument. (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537–1538.) For the same reason, as a matter of fairness, courts may decline to consider issues raised for the first time at oral argument. (*California Redevelopment Assn. v. Motosantos* (2013) 212 Cal.App.4th 1457, 1500.) Because the issue was not raised below, the trial court did not have an opportunity to consider evidence as to whether there was a joint representation of "two or more clients" with a "common interest." (§ 962.) And as Appellants did not adequately raise this issue in the trial court, they are precluded from raising the issue on appeal. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419.) As such, we will not consider it for the first time here as we deem this argument forfeited. (*In re N.R.* (2017) 15 Cal.App.5th 590, 598 [claim

20

involving "issue of fact rather than a pure question of law," is forfeited by failure to raise it below].)

Even if Appellants had not forfeited this argument, we would not reverse the trial court's disqualification order on this ground. The possibility that some of Michael's communications with Reiner might be unprotected under the joint-client exception (§ 962) does not negate the requirement of disqualification in this case. Disclosure of client communication is not the only concern; there are also broader interests at play. (*Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 761–762 ["Our courts have distinguished the rule against representing conflicting interests from the attorney-client evidentiary privilege noting that the former is broader than the latter"].) "The California Supreme Court has . . . repeatedly held that the disqualification rules are not merely intended to protect client confidences or other 'interests of the parties'; rather, '[t]he paramount concern . . . [is] to preserve public trust in the scrupulous administration of justice and the integrity of the bar.' [Citation.] In light of these significant public interests, we do not agree that matters of disqualification should be determined solely by reference to evidentiary rules." (*Fiduciary Trust Internat. of California v. Superior Court* (2013) 218 Cal.App.4th 465, 485–486, fn. omitted.) As to the issue of attorney disqualification, in the instant matter especially, joint representation is not dispositive. (*Id.* at pp. 482–486.)

E. Waiver

" 'Once the proponent makes a prima facie showing of a confidential attorney-client communication, it is presumed the communication is privileged and the burden shifts to the opponent to establish waiver, an exception, or that the privilege does not for some other reason apply.'

[Citations.]" (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1101.) Appellants contend the trial court erred by failing to recognize that Respondents "waived the attorney[-]client privilege when they filed protected documents in federal court in the Abhari litigation." We disagree. Appellants have failed to establish Respondents waived their privilege.

A judgment or order is presumed correct, and reversible error must be affirmatively shown. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "Every argument presented by an appellant must be supported by both coherent argument and pertinent legal authority." (*Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 743 (*Kaufman*).) "Generally, asserted grounds for appeal that are unsupported by any citation to authority and that merely complain of error without presenting a coherent legal argument are deemed abandoned and unworthy of discussion." (*Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689; see *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 162 (*United Grand Corp.*)) [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "]

Appellants assert Respondents included certain e-mails between Reiner and Michael in the disqualification motion filed in the Abhari litigation, and by doing so, Respondents waived attorney-client privilege as to all of their communications with and information provided to Reiner. To this end, they represent:

> "Exhibit S in the Abhari Motion to Disqualify is the same as Mirch's Ex. 13 in Abhari opposition; similarly . . .
> Exhibit F in Abhari is the same as Mirch's Ex. 15; . . . Ex. Q in Abhari is the same as Mirch's Ex. 18; . . . Ex. J in Abhari is the same as Mirch's Ex 19; and . . . Exhibit R in Abhari is the same as Mirch's Ex 22."

In support of this argument, Appellants point us to the declaration of Marie Mirch, filed in the instant action, wherein she attests that the alleged privileged e-mails constituting Exhibits 13, 15, 18, 19, 21, and 22 "came into the Mirches' possession when [Elite and Slater's] filed them publically [*sic*] as exhibits to their motion to disqualify." We note that Kevin Mirch made a similar representation in his declaration filed in the instant matter as well. Thus, based on those two declarations filed below, Appellants claim that they came into possession of the subject e-mails after Elite and Slater's filed those e-mails in support of their motion to disqualify in the Abhari litigation. Notably, Appellants have not cited to Slater's and Elite's actual filing of the e-mails in the district court. Rather, they rely on their declarations to offer the conclusion the exhibits are the same.

Further, we observe that in filing Exhibits 13, 15, 18, 19, 21, and 22 in support of the opposition to the motion to disqualify in the Abhari litigation, the plaintiffs filed a notice of lodgment that included a declaration from Kevin Mirch. In that declaration, Kevin Mirch stated that he received the subject exhibits from Abhari. Therefore, Kevin Mirch's declaration in the Abhari litigation calls into question Appellants' representation in the instant matter that they came into possession of the subject e-mails when Slater's and Elite filed them in support of their disqualification motion in district court.

Here, Appellants' waiver argument hinges upon their representation that they came into possession of the subject e-mails when the defendants filed those e-mails as part of their motion to disqualify in the Abhari litigation. Yet, that contention is contradicted by Kevin Mirch's declaration wherein he claims Abhari gave him the e-mails. As such, the factual premise

on which Appellants rely is contested, and we cannot resolve a factual dispute in an abuse of discretion review. (See *Charlisse C.*, *supra*, 45 Cal.4th at p. 159.)

Below, the superior court made a finding that Appellants had not waived the attorney-client privilege by filing the subject e-mails in support of their qualification. That finding is supported by substantial evidence based on Kevin Mirch's declaration that he received the subject e-mails from Abhari. Those e-mails were between Michael and Reiner. Abhari introduced Michael to Reiner and told Michael that Reiner was his attorney. Reiner appeared with Abhari at the mediation of the Abhari litigation. Thus, the trial court could reasonably infer that Reiner was communicating with one of the parties suing Respondents (Abhari) and his new attorneys (the Mirch Firm).

And Appellants have failed to provide us with adequate legal authority to support their challenge here. Indeed, the only authority Appellants cite to support their waiver argument is rule 502 of the Federal Rules of Evidence (28 U.S.C.), but they do not sufficiently explain why the district court or the superior court erred in failing to find waiver under that rule.[8] Accordingly, Appellants have not carried their burden on appeal as to their waiver argument. (See *Kaufman*, *supra*, 195 Cal.App.4th at p. 743; *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 162.)

---

[8]    Additionally, any waiver by Respondents of their attorney-client privilege in the disqualification motion in the Abhari litigation did not absolve Reiner of his breach of his duty of loyalty to Elite, which took place before the filing of the disqualification motion, or his obligation to maintain his clients' confidences. Moreover, it is Kevin Mirch's declaration filed in the Abhari litigation that strongly supports this conclusion.

F. Trial Court's Reliance on Communications After the Termination of the Attorney-Client Relationship

Appellants take issue with the following finding of the trial court: " . . . Def.'s Ex. 26 (referencing exs. 16-17, 20-21). That exhibit, however, shows Mirch received the communications between [Michael] and Reiner and the contents do not indicate a voluntary disclosure of Elite's confidential privileged information." Appellants contend the trial court erred by relying on these communications because they are not attorney-client confidential communications. We see no error in the trial court's discussion of these e-mails.

As a threshold matter, we observe that Appellants do not appreciate the context in which the trial court discussed Exhibit 26. The court specifically cited to that exhibit when addressing Appellants' waiver argument. To this end, the court stated:

> "[Appellants] also argue defendants waived the privilege when they filed the certain emails in support of their disqualification motion. Opp. at 12-14, citing e.g., Def.'s Ex. 26 (referencing exs. 16-17, 20-21). That exhibit, however, shows Mirch received the communications between [Michael] and Reiner and the contents do not indicate a voluntary disclosure of Elite's confidential privileged information."

The court relied on these communications as evidence Reiner was providing information to the Mirch Firm, even if it was ultimately provided by Abhari. The trial court's finding that these communications came from Reiner, not Abhari, is supported by substantial evidence. Each communication was between Reiner and Michael; Abhari was not included in them. Thus, it is evident Reiner was the source of these communications.

25

And they are evidence Reiner was transmitting communications he had with his former client, privileged or not, to counsel for the adversary of his former client.

Moreover, Exhibit 26 consisted of a portion of the documents that the plaintiffs (represented by the Mirch Firm) filed in support of their opposition to the motion to disqualify in the Abhari litigation. Many of these documents consist of e-mails between Michael and Reiner, and some specifically relate to Michael's belief that Reiner was Elite's attorney for a period of time. In addition, there was an email from Reiner (with the address martinreinerlaw@yahoo.com) addressed to attorneys at the Mirch Firm, claiming that Michael had paid money to Reiner, leading to the reasonable inference that Reiner was sharing information with the Mirch Firm about his dealings with Michael and Elite, even discussing the context of his legal representation of Elite.

G. Presumption That Material Confidential Information was Transmitted to the Mirch Firm

Appellants contend the trial court should have denied the disqualification motion because Respondents failed to satisfy their burden of showing the privileged attorney-client information Reiner received in the trademark infringement litigation was material to the current matter. Appellants also assert they rebutted the presumption the Mirch Firm received privileged communications from Reiner as the firm's attorneys attested they received the information in their complaint from sources other than Reiner.

When determining whether the Mirch Firm had presumed or actual access to material, privileged information, the trial court relied on *Shadow Traffic*, *supra*, 24 Cal.App.4th 1067. There, the court concluded that once the party moving for disqualification has established its counsel transmitted

26

confidential information to the potential expert, " 'a rebuttable presumption arises that the information has been used or disclosed in the current employment.  The presumption is a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff.  [Citation.]' [Citation.]" (*Id*. at p. 1085.) "As the purpose of this presumption is to implement the public policy of protecting confidential communications, the presumption is one affecting the burden of proof.  [Citation.]  The effect of this type of presumption 'is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.' [Citation.]" (*Ibid*.)  Further, the trial court found plaintiff's attorneys had transmitted confidential information to an expert subsequently retained by the defendant's attorneys, giving rise to the presumption the expert used or disclosed this confidential information in its employment with the defendant's attorneys.  The burden then shifted to the defendant's attorneys to persuade the court by a preponderance of the evidence it had not received the confidential information.  (*Ibid*.)

Employing this analysis in the instant matter, the trial court found that Respondents had shown that the Mirch Firm received confidential information, "including communications between [Michael] and Reiner, via Zia Abhari."  This finding is supported by substantial evidence based on the multiple e-mails the Mirch Firm had in its possession that were between Michael and Reiner.  In addition, at least one email from Reiner to attorneys at the Mirch Firm indicated that he was talking with those attorneys regarding his interaction with Michael regarding the previous trademark litigation.  The court found the information and documentation conveyed to Reiner was materially relevant to the instant matter.  This finding is supported by substantial evidence.  During the Orange County litigation, the

27

Mirch Firm sent a letter to counsel for the Slater's parties, acknowledging information in the trademark infringement litigation was relevant to Ace Foods' claims concerning the value, or lack thereof, of the Slater's franchise. Moreover, the trial court below observed that, although the instant matter concerned different plaintiffs than the Abhari litigation and Orange County litigation, the information Elite provided to Reiner was "relevant to [Appellants'] claims, particularly given the breadth of the allegations in the operative complaint." For example, the operative complaint in the instant action accuses Respondents (among others) of engaging in a "nationwide" "scheme" to inflate the value of various franchises and entice would be buyers to overpay for them. And the complaint specifically includes allegations that "Daphne's, Slater's and Mimi restaurants were all part of the scheme." The complaint in the Abhari litigation also included alleged wrongdoing involving the value of certain Daphne's restaurant franchises as did the operative complaint in the Orange County litigation.[9] Therefore, the trial court's findings triggered the presumption Reiner disclosed material confidential information to the Mirch Firm in his communications with them. (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1085.)

"When a judicially created presumption affecting the burden of proof is triggered, the question of whether the party who has the burden of establishing the nonexistence of the presumed fact has carried its burden of persuasion is an issue for the trier of fact to decide, not a reviewing court. [Citation.] Thus, we may not reweigh the evidence or substitute our deductions for those of the trial court. [Citations.]" (*Shadow Traffic, supra,*

---

[9] Indeed, the complaint in the Abhari litigation specifically mentions the eight Daphne's restaurants that Karma purchased, which are the basis for the instant matter.

24 Cal.App.4th at p. 1087.) Here, the trial court found the Mirch Firm's declarations stating they had no relationship with Reiner were insufficient to rebut the presumption, given the other evidence showing Reiner was providing information to them and Reiner's declaration stating he had communicated with the firm as a witness in the Abhari litigation. The trial court also found not credible the Mirch Firm's claim Reiner was only acting as a translator for Abhari at the mediation hearing. We will not reweigh the evidence or substitute our deductions for those of the trial court. Because Appellants failed to rebut the presumption Reiner disclosed material confidential information to the Mirch Firm, the trial court did not abuse its discretion in granting the motion to disqualify the Mirch Firm.

DISPOSITION

The order disqualifying the March Firm is affirmed. Respondents are entitled to their costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DO, J.

CASTILLO, J.

29